**DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| SANDRA NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LONG REEF CONDOMINIUM | ) | Civil Action No. 2011-0051 |
| HOMEOWNERS ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |
| | ) | |
| LONG REEF CONDOMINIUM | ) | |
| HOMEOWNERS ASSOCIATION, | ) | |
| | ) | |
| Counter-Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SANDRA NELSON, | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| ——————————————————— | ) | |

**Attorneys:**
**Sunshine S. Benoit, Esq.,**
St. Croix, U.S.V.I.
  *For Plaintiff/Counter-Defendant*

**Douglas L. Capdeville, Esq.,**
**Melissa P. Ortiz, Esq.,**
**Ellen G. Donovan, Esq.,**
St. Croix, U.S.V.I.
  *For Defendant/Counter-Claimant*

## <u>MEMORANDUM OPINION</u>

THIS MATTER came before the Court for a bench trial at which Plaintiff Sandra Nelson

("Nelson") presented evidence in support of her reasonable accommodation and disparate

treatment claims against Defendant Long Reef Condominium Homeowners Association ("Long

Reef") under the Fair Housing Act ("FHA"), as amended, and her claim for intentional infliction

of emotional distress.[1] Long Reef, as Counter-Claimant, presented evidence in support of its request for a declaratory judgment.[2] Post-trial proposed findings of fact and conclusions of law were subsequently filed by each party. (Dkt. Nos. 229, 230).

Upon consideration of the evidence presented at trial and the written submissions by the parties, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure. As discussed below, the Court finds that Long Reef violated 42 U.S.C. § 3604(f)(3)(B) of the FHA when it constructively denied Nelson's request for a reasonable accommodation to live in her condominium with her emotional support animal, but dismisses Nelson's disparate treatment and intentional infliction of emotional distress claims. Accordingly, the Court will: (1) enter judgment for Nelson on her reasonable accommodation claim; (2) award Nelson actual damages in the amount of $12,000, punitive damages in the amount of $45,000, and reasonable attorney's fees and costs; and (3) dismiss Long Reef's counterclaim for a declaratory judgment.

## I.    FINDINGS OF FACT

### A.  Introduction

1.   Nelson is a natural person and resident of St. Croix, United States Virgin Islands. (Dkt. No. 6 at 1; Am. Compl. ¶ 4).

2.   Long Reef is an eighty-four-unit condominium association established pursuant to the "Condominium Act," Chapter 33, Title 28 of the Virgin Islands Code. (Def. Ex. 1).

3.   Nelson purchased a condominium unit at Long Reef in April 2004, and moved into the

---

[1] At trial, Nelson testified on her own behalf, and called as witnesses Dr. Arakere Prasad, Dr. Dianne Brinker, Richard Chiocco, and Cary Guilbeau.

[2] Long Reef called as witnesses Johanna Renzi, its corporate designee under Federal Rule of Civil Procedure 30(b)(6), and Dr. Olaf Hendricks.

unit in November 2004. (May 27, 2015, Tr. at 74:18-23; 75:9-11).[3]

4.    In its Rules and Regulations, dated January 7, 1988, Long Reef has a "no pets" policy that provides: "No animals of any kind shall be raised, bred or kept in any Unit or in the Common Elements." (Def. Ex. 1).

5.    On January 13, 2006, Long Reef revised its "no pets" policy as follows:

> No animals of any kind shall be raised, bred or kept in any unit or in the common areas. The only exception to this rule is as follows: several cats are presently on Long Reef property as of the date of these revised rules. Only these cats are allowed to remain [on the property] provided that:
> - Said cats must have a collar and ID tag and be registered with the manager.
> - Litter boxes and food for these cats must be kept inside the unit and not outside or in the common area.
> - If any cat has kittens, kittens are not allowed to remain on the premises.
>
> If additional stray cats appear, occupants shall not feed them and the manager shall call the animal shelter to pick them up.

(Def. Ex. 2). This revision "grandfathered-in" two cats that had been on the Long Reef property for "a while." (May 28, 2015 Tr. at 169:9-13).

## B.  Events in 2009

6.    In June 2009, Nelson lost "a very good friend," who had cancer, to suicide. (May 27, 2015, Tr. at 75:16-17, 22).

7.    Nelson had known this close friend for two years prior to his suicide, and had helped him take a trip to South America, where he went to search for alternative cancer medications. (*Id*. at 75:22-25).

8.    The suicide of her friend was a traumatic event for Nelson. (*Id*. at 75:3-4). She was "sad" after his death. (*Id*. at 76:5-6).

---

[3] Nelson's brother, Lenny Nelson, lived in the unit from June 2004 to November 2004. (May 27, 2015, Tr. at 74:24-25; 75:1-8).

9.   In August 2009, Nelson, a musician, was playing at the Pickled Greek restaurant on St. Croix, when two gunman shot into the restaurant, killing her close friend and fellow musician, Peter. (*Id*. at 76:7, 10-17).

10.  Nelson was seated six-feet away from Peter when he was shot and killed. (*Id*. at 76:19-22).

11.  Nelson was "devastated" after the shooting. She was "scared" and "couldn't really function." (*Id*. at 78:12, 15-18).

12.  The morning after the shooting, Nelson asked her sister to open for her an Internet café that Nelson owned on St. Croix, called "Surf the Net." (*Id*. at 78:19-22; 74:3-5).

13.  In November 2009, Nelson and her brother, Lenny Nelson, who also lived on St. Croix, performed at the Deep End restaurant in Christiansted and at another location in Frederiksted. (*Id*. at 78:23-25; 79:1-12).

14.  After the performance in Frederiksted, Nelson offered her brother a ride home, but he declined because he had already arranged for a ride. (*Id*. at 79:10-14).

15.  The next morning, Nelson learned from her friends that her brother had been killed in a head-on collision with a drunk driver. (*Id*. at 79:23-25; 80:1-4).[4]

16.  Upon learning of her brother's death, Nelson collapsed and "couldn't get off the ground." (*Id*. at 80:24-25; 81:1-2). A friend picked Nelson off the ground and helped her walk up the stairs. (*Id*. at 81:3).

17.  In December 2009, another close friend and fellow musician of Nelson's drowned by Fort Christiansvern in Christiansted. (*Id*. at 83:4-19).

---

[4] In 1993, Nelson's husband was also killed in a head-on collision with a drunk driver. (May 27, 2015, Tr. at 82:19-22). Nelson's husband had been riding home on his motorcycle, with her then seven-year-old daughter, when the accident occurred. (*Id*.). Nelson's daughter was thrown from the motorcycle, but survived. (*Id*. at 82:22-25).

## C.  Effect of the 2009 Events

18. After the events in 2009, Nelson was "very depressed" and "grief-stricken." (*Id*. at 86:2-3). She cried daily for hours at a time, and suffered from panic attacks. (*Id*. at 86:17-25; 87:11-14). Nelson had no control over the panic attacks and, at the time of the trial, was still receiving treatment for panic attacks. (*Id*. at 87:17-23; 113:17-21; 114:12-17).

19. Nelson also had difficulty sleeping and suffered from nightmares. (*Id*. at 88:5-25; 89:1-10). The lack of sleep and nightmares made it difficult for Nelson to work and to concentrate. (*Id*. at 89:11-17). Nelson was often "tired and exhausted." (*Id*. at 89:18).

20. Nelson's difficulty concentrating affected her ability to run and operate her Internet café. (*Id*. at 89:23-25). It also "greatly [a]ffected" her ability as a musician to sing. (*Id*. at 90:1).

21. Nelson was unable to leave her condominium unit at Long Reef because she did not want to see anyone. (*Id*. at 90:13-16). It was hard for her to communicate with people, and she did not want to have breakdowns in front of people. (*Id*. at 90:17-21).

22. Nelson also did not leave her condominium unit because of fear. (*Id*. at 91:2-4).

23. Before the events in 2009, Nelson played music after dark at beaches. (*Id*. at 91:7-10). After the events, she no longer felt safe playing at places where she could not see what was behind her. (*Id*. at 91:10-11). Nelson only played music indoors where she felt safe and could see who was coming in the door. (*Id*. at 91:13-15).

24. Nelson canceled paid performances out of fear for her safety after the murder of her friend at the Pickled Greek. (*Id*. at 97:23-25; 98:1-10). She also canceled paid performances because she was "having too many breakdowns." (*Id*. at 96:10-25).

25. There were numerous occasions when Nelson was unable to work at her Internet café due to her depression and the fact that people would come in and ask her questions about

the events that had occurred. (*Id*. at 91:19-24; 92:2-8).

26. After the death of her brother and close friends, Nelson closed the café several times, and shortened the time that the café was open. (*Id*. at 92:13-18).[5]

27. When the café was open, Nelson experienced breakdowns two to three times per week, and would have to lock the front door and sit and cry in the bathroom until she felt better. (*Id*. at 92:23-25; 93:1-12).

28. Several times, Nelson's sister, Carol, helped Nelson operate the Internet café. (*Id*. at 93:25; 94:1-6). The first time was after Nelson's friend, Peter, was murdered at the Pickled Greek. (*Id*. at 94:7-11). Carol continued to help Nelson from 2009 through 2012. (*Id*. at 94:12-25; 95:1-25).[6]

29. In November 2011, Nelson filed a lawsuit on behalf of herself and her brother's other heirs to recover the cost of her brother's funeral expenses. (*Id*. at 186:12-20).

30. Nelson felt her brother was "vilified" by opposing counsel. (*Id*. at 187:24-25). She felt the attorney "spoke about [her brother] quite frequently with no respect whatsoever." (*Id*. at 188:3-4).

31. The perceived vilification of her brother caused Nelson stress and anxiety. (*Id*. at 188:5-8). Nelson had "extreme grief" over the loss of her brother. (*Id*. at 188:7-8).

### D.  Acquisition of "Pawla"

32. In September 2009, Nelson rescued a seven-pound stray Chihuahua while housesitting for a friend. (*Id*. at 115:3-25; 116:1-16). Initially, the Chihuahua, who Nelson named

---

[5] Nelson was the sole proprietor of the Internet café; she did not have any employees. (May 27, 2015 at 93:22-24).

[6] In October 2011, a fire broke out in Nelson's Internet café causing damage. (May 27, 2015 Tr. at 85:5, 15-18). Nelson was able to reopen the café in the fall of 2012. (*Id*. at 95:19-25). Nelson's sister helped operate the café after it reopened in 2012. (*Id*. at 94:14-19).

"Pawla," stayed at the home where she was found. (*Id*. at 116:19, 23-24). However, in October 2009, the owner of the home gave Pawla to Nelson,[7] who then took Pawla to live with her at Long Reef. (*Id*. at 116:25; 117:1-11).

33. Nelson brought Pawla to live with her at Long Reef because Pawla brought Nelson "comfort." (*Id*. at 118:1-3). Pawla also brought Nelson out of "depressed states of mind" and helped Nelson to start to feel joy.  (*Id*. at 118:9-13).

34. Pawla helps Nelson cope with her panic attacks and nightmares. (*Id*. at 118:25; 119:1-12). She also helps Nelson to "feel safe" and alerts Nelson when there is a stranger nearby. (*Id*. at 118:3; 119:25; 120:1). On one occasion, Pawla alerted Nelson when a stranger approached her from behind at the beach. (*Id*. at 120:9-19). Nelson felt threatened by the stranger. (*Id*. at 121:6).

35. Nelson takes Pawla everywhere she goes—including work—except for buildings where animals are not allowed. (*Id*. at 121:12-20; Def. Ex. 22).

36. When Nelson moved into her condominium unit at Long Reef, she knew that Long Reef had a "no pets" policy. (*Id*. at 123:25; 124:1-2). Nonetheless, Nelson moved Pawla into Long Reef because she reportedly needed Pawla for her "well-being." (*Id*. at 124:9-11).

37. Nelson has never received any complaints from Long Reef about Pawla's behavior. (*Id*. at 121:21-23).

### E.  Treatment after 2009 Events

38. A couple of days after the death of her brother, Nelson called her friend, Trilby Seiber ("Trilby"). (*Id*. at 81:14-25; 82:1-3; 98:24-25; 99:1-2). Trilby was a retired social worker, and had also worked as a family counselor. (*Id*. at 82:4-13).

---

[7] Nelson explained that her friend wanted to keep Pawla, but was advised by her doctor not to keep a stray dog due to a medical condition. (May 29, 2015 Tr. at 85:1-2).

39.   Nelson began speaking with Trilby about her emotional condition a couple of times per week in August 2009, after Peter was murdered. (*Id*. at 99:8-20). Nelson continued to speak with Trilby until early 2011, when Trilby moved off-island to Florida. (*Id*. at 100:1-8, 17-22).

40.   In August 2010, Nelson experienced an "extremely heavy" panic attack. (*Id*. at 105:14-19). She thought she was having a heart attack. (*Id*. at 105:17; 107:6-9). In response, Nelson went to see her primary care doctor, Dr. Arakere Prasad ("Dr. Prasad"). (*Id*. at 105:20). Dr. Prasad was not at the office when she arrived, but his nurse practitioner, Michelle McCannless ("Nurse McCannless"), was there. (*Id*. at 105:21-23).

41.   Nurse McCannless was the person that examined and treated Nelson in August 2010. (*Id*. at 105:7-13; May 28, 2015 Tr. at 10:25; 11:1-7).[8]

42.   A medical record, dated August 20, 2010, indicates that Nelson's chief complaint was "stress disorder – palpitation – depress[ion]." (Pl. Ex.1; *see also* May 28, 2015 Tr. at 26:25; 27:1-2). The medical record also states that Nelson "was present for shooting of close friend [and that her] brother was killed." (*Id*.).

43.   On August 20, 2010, Nurse McCannless performed two electrocardiograms ("EKGs") on Nelson. (May 27, 2015 at 105:24-25; 106:1-4, 12-14; Pl. Ex. 1). The results of the EKGs were normal. (May 28. 2015 Tr. at 39:10-20).

44.   Following the EKGs and an examination, Nurse McCannless diagnosed Nelson with anxiety disorder and prescribed Nelson a .25 milligram dose of Xanax, an anti-anxiety

---

[8] Nurse practitioners "function independently with minor supervision by a physician," and are certified to practice a particular specialty for which they have been trained. (May 28, 2015 Tr. at 8:18-25; 10:11-15). Nurse practitioners are also qualified to make diagnoses. (*Id*. at 31:23-25; 32:1-2).

medication. (*Id*. at 31:18-22).[9] Nurse McCannless also referred Nelson to Dr. Dianne Brinker ("Dr. Brinker"), a licensed clinical social worker. (May 27, 2015 Tr. at 106:14-16; May 28, 2015 Tr. at 40:25; 64:5-6; Pl. Ex. 1, 2).[10]

45.   The treatment and care provided to Nelson by Nurse McCannless was approved by Dr. Prasad, her supervisor. (May 28, 2015 Tr. at 14:21-23; 15:2).

46.   Nelson had her first visit with Dr. Brinker on August 23, 2010—approximately ten months after she acquired Pawla. (May 27, 2015 Tr. at 107:15-20; May 28, 2015 at Tr. 74:6-9).

47.   Nelson continued to have therapy sessions with Dr. Brinker "sporadically" between 2010 and 2013. (May 28, 2015 at Tr. at 64:20-22; 77:20-23; May 27, 2015 Tr. at 107:21-25).

48.   Dr. Brinker has a bachelor's degree in psychology and French from the University of Pittsburgh, a master's degree in psychiatric social work from Tulane University, and a Ph.D. in clinical social work from the University of Southern California. (May 28, 2015 Tr. at 41:1-8). She taught psychology at the University of the Virgin Islands for approximately eight years in both the undergraduate and graduate programs. (*Id*. at 42:1-9).

49.   Dr. Brinker specializes in family counseling, marriage counseling, drug and alcohol addiction, depression, post-traumatic stress disorder ("PTSD"), and personality disorders. (*Id*. at 42:10-16). She also practices psychotherapy, which consists of a clinical diagnosis and a treatment plan. (*Id*. at 42:19-25).

---

[9] A medical record, dated January 18, 2011, indicates that Dr. Prasad prescribed Nelson five refills of Xanax for her anxiety disorder. (Pl. Ex. 1; May 28, 2015 Tr. at 28:11-25).

[10] Dr. Prasad had previously referred his patients to Dr. Brinker for anxiety or depression problems. (May 28, 2015 Tr. at 16:15-20).

50. Dr. Brinker has diagnosed many people with severe depression and PTSD. (*Id*. at 43:1-8).

51. At her first therapy session with Dr. Brinker, Nelson told Dr. Brinker that she had "an emotional support animal." (May 27, 2015 Tr. at 108:16-17). Nelson explained to Dr. Brinker that the animal was "a great comfort," and that she "didn't feel comfortable living in [her] condo" because she was told that having an animal was against the rules. (*Id*. at 108:17-21).

52. Dr. Brinker observed that Nelson was "devastated" that she was not allowed to live in her condominium unit at Long Reef with her "little dog." (May 28, 2015 Tr. at 45:8-15).

53. Dr. Brinker learned from Nelson that the "little dog" was a "warning system" for Nelson, who no longer felt safe playing music at night after the murder of her friend and death of her brother. (*Id*. at 45:23-25, 46:1-10).[11]

54. Dr. Brinker also learned from Nelson that prior to owning the dog, Nelson was "terrified" to go anywhere "because so many people in her life had been killed so suddenly and violently." (*Id*. at 46:15-18).

55. Dr. Brinker understood that Nelson took "the dog everywhere with her," including to therapy. (*Id*. at 46:11; 47:6-7). According to Nelson, the dog made her "feel safe." (*Id*. at 46:14-15).

56. During therapy sessions, Dr. Brinker personally observed the bond between Nelson and her dog, and noticed that the dog provided "comfort" for Nelson. (*Id*. at 47:3-9).

57. In a letter dated January 21, 2011, and addressed to Juan Figueroa Serville at Americans with Disabilities, Dr. Brinker explained that Nelson sought counseling "because she was

---

[11] Nelson told Dr. Brinker the story that she "was almost robbed at the beach and [that] the little dog chased the robber away." (May 28, 2015 Tr. at 46:13-14; 58:25; 59:1-9).

suffering from severe depression" and that Nelson's "immediate stressor," at the time, was that she was told by Long Reef that she could not keep her Chihuahua in her condominium unit. (Pl. Ex. 14).[12]

58.  Dr. Brinker also stated in the letter that Nelson witnessed first-hand the murder of her friend, Peter, at the Pickled Greek and that, a couple of months after the murder, Nelson's brother was killed by a drunk driver. (*Id*.).

59.  Dr. Brinker stated further that when the "little dog" came into Nelson's life it "gave [Nelson] comfort" and "a sense of safety." (*Id*.).

60.  Dr. Brinker concluded the letter by recommending to a reasonable degree of psychological certainty that, based upon her treatment, consultations, and observations of Nelson, she should "have a dog for safety and companionship." (*Id*.; May 28, 2015 Tr. at 50:4-9, 13-15).

61.  Dr. Brinker affirmed that the statements contained in the letter are true and correct to a reasonable degree of psychological certainty. (May 28, 2015 Tr. at 50:4-15).

62.  In Dr. Brinker's opinion, Pawla is a "necessary emotional support dog" for Nelson. (May 28, 2015 Tr. at 52:10-12).

63.  Many people have asked Dr. Brinker to write a letter stating that a dog is "an essential therapy dog" when in fact it is not. (*Id*. at 47:23-25; 48:1-3). However, Dr. Brinker will not write those kinds of letters for any amount of money. (*Id*. at 48:1-3).

64.  Nelson's situation is only one of three where Dr. Brinker has seen a "genuine need for a therapy dog." (*Id*. at 48:4-7; 50:16-20).

---

[12] The letter to Juan Figueroa Serville at Americans with Disabilities was written by Dr. Brinker at the request of Nelson. (May 28, 2015 Tr. at 74:10-13).

65. In her evaluation of Nelson, Dr. Brinker determined that Nelson was "severely depressed" and needed more than Xanax to improve her mood. (*Id*. at 64:4-13). Accordingly, Dr. Brinker referred Nelson, by handwritten letter, to Dr. Prasad for an antidepressant prescription. (*Id*. at 63:2-13).[13]

66. Nelson again went to see Dr. Prasad in February 2013 about her mental and emotional condition. (May 27, 2015 Tr. at 113:7-16; May 28, 2015 Tr. at 29:11-15).

67. Dr. Prasad found, to a reasonable degree of medical certainty, that Nelson "suffers from chronic [anxiety] by history,"[14] and that Pawla "has helped [Nelson] therapeutically for her [anxiety] condition." (Pl. Ex. 18; May 28, 2015 Tr. at 15:22-25; 16:1-4).[15] Dr. Prasad, "[a]s her primary care physician[,] strongly recommend[s] that [Nelson] continue to keep her dog which has been a vital support for her psychologically." (Pl. Ex. 18).

68. Dr. Prasad, who completed his medical education in India, had a private practice in India and worked as a government medical officer in the area of pediatrics in Guyana before he moved to St. Croix, where he has worked as an emergency room physician, a staff physician in pediatrics, and a general physician in private practice. (May 28, 2015 Tr. at 7:3-18).

69. Dr. Prasad, a physician with twenty-nine years of experience on St. Croix, is able to determine to a reasonable degree of medical certainty when a patient is suffering from depression or anxiety. (*Id*. at 7:11-18; 37:17-21).

---

[13] It is unclear from the record whether Dr. Prasad in fact prescribed Nelson an antidepressant. (May 28, 2015 Tr. at 86:20-25, 87:1-7).

[14] The "history" referenced is Nelson's medication history as well as the history written in her medical records. (May 28, 2015 Tr. at 30:14-22; 36:21-22).

[15] Dr. Prasad's findings were documented in a signed letter, dated February 7, 2013, which was prepared by Dr. Prasad with help from his staff. (May 28, 2015 Tr. at 15:5-15).

**F.   Examination of Nelson by Dr. Olaf Hendricks**

70.   Dr. Olaf Hendricks, an expert in the field of psychiatry, was retained by Long Reef to perform a mental status examination of Nelson, which is a snapshot of the mind at a particular point in time. (*Id*. at 110:16-18, 20-23; 119:10-15; May 27, 2015 Tr. at 172:1-3).

71.   Dr. Hendricks earned a bachelor of science and medical degree from Howard University. (May 28, 2015 Tr. at 104:2-3). He completed his residency in Washington, D.C. at Howard University and Georgetown University, and did one month of training in the Virgin Islands. (*Id*. at 104:3-7).

72.   The examination by Dr. Hendricks took place on January 10, 2013, and lasted seventy-five minutes. (*Id*. at 114:12-14; 117:16-17).

73.   The purpose of the examination was to determine "whether . . . [Nelson] has [a] psychiatric condition [that] prevent[s] her from being able to engage in [a] major life activity, and whether a pet . . . is a necessary component of [] treatment." (*Id*. at 111:22-25; 112:1-2).

74.   During the examination, Nelson reported to Dr. Hendricks that her "major problem" was that "she couldn't go back to her own apartment as a result of Long Reef suing her." (*Id*. at 116:23-25).

75.   Nelson explained to Dr. Hendricks that she moved out of Long Reef because she was "being fined." (*Id*. at 116:25; 117:1).

76.   Nelson also reported to Dr. Hendricks that her "source of happiness" is her grandchildren and her dog. (*Id*. at 117:17-20). Nelson explained to Dr. Hendricks that she takes Pawla everywhere she goes, including to play music outdoors, and that Pawla makes her feel

better. (*Id*. at 117:21-23).

77. Nelson told Dr. Hendricks that she received a letter from Long Reef about her dog in December 2009. (*Id*. at 118:2-4). She also told Dr. Hendricks that in 2009 her friend committed suicide; another friend was murdered; her brother was killed in a motor vehicle accident; and a friend drowned. (*Id*. at 118:4-9).

78. Nelson informed Dr. Hendricks that Dr. Brinker and Trilby had both written letters in support of her dog. (*Id*. at 118:9-11).[16]

79. Nelson also informed Dr. Hendricks that she can't sleep at night; she has nightmares; and sometimes sleeps all day. (*Id*. at 119:5-7).

80. During his examination of Nelson, Dr. Hendricks observed, *inter alia*, that Nelson "had a sad appearance"; "became tearful several times during the interview"; and that "her mood was sad." (*Id*. at 119:22-23; 120:6).

81. Based upon his observations, Dr. Hendricks made the following findings:

> There is no doubt that the evaluee has experienced numerous misfortunes, any of which, by itself, has the potential to create emotional distress. The serial occurrence of these episodes is not common. . . . [T]he fact that she is able today to play her music, notwithstanding the damping effects of the economy on most musicians, and run her business speaks to her resilience. By history, she experienced the symptoms of a post-traumatic stress disorder after a fellow musician was shot to death while next to her in August of 2009. She was also described as having severe depression, both by her friend [and] a family counselor. She did take Xanax, a [benzodiazepine], for about one year, August 2010 to August 2011[.] Since approximately August of 2011, she has not been on any depression medication and has been using meditation and music to help her emotionally.
>
> At the time of my evaluation, she manifested no signs of a post-traumatic stress disorder, and, in fact, her only positive symptoms [were] tearfulness

---

[16] The letter written by Trilby was dated March 12, 2010. (May 27, 2015 Tr. at 136:13-25, 137:1-4). Nelson never gave the letter to anyone at Long Reef because she wasn't "sure what information [Long Reef was] going to require," and she felt the letter contained personal information that she did not want to share "unless necessary." (*Id*. at 137:5-13).

and insomnia. Interestingly, one of the causes of insomnia is caffeine, which she uses moderately but daily. On the other hand, Miss Nelson is still experiencing crying spells and anger over her not living in her own condominium unit. That, in my professional opinion, is the proximate cause of her current emotional state.

(*Id*. at 124:6-25; 125:1-15).

82. Dr. Hendricks's clinical impressions of Nelson were that: (1) she had post-traumatic stress disorder by history, but that it was in remission; and that (2) she suffered from bereavement. (*Id*. at 126:6-7; 150:9-15).

83. Dr. Hendricks did not see any signs of post-traumatic stress disorder in Nelson at the time of his examination, but stated that, "in the context of the things that had happened to her," he could understand if she had experienced post-traumatic stress disorder. (*Id*. at 126:11-19; 148:24-25; 149:1-7, 13-20; 150:5-8).

84. Dr. Hendricks acknowledged that between 2009 and 2012, Nelson's inability to work at her store, get up, or leave her condominium unit was consistent with post-traumatic stress disorder. (*Id*. at 152:1-14).

85. At the time of Dr. Hendricks' examination, Nelson's post-traumatic stress disorder symptoms were "less than they used to be" or had "totally disappeared." (*Id*. at 127:25; 128:1-7).

86. Dr. Hendricks could not opine one way or the other whether Nelson's post-traumatic stress disorder would recur. (*Id*. at 150:16-20).

87. To a reasonable degree of psychiatric certainty, it is Dr. Hendricks' opinion that Nelson does not have a mental or psychiatric disorder that limits one or more of her major life activities, and that Nelson does not need an emotional support animal as part of her treatment. (*Id*. at 133:9-25; 134:1-8; 145:22-25). Rather, Nelson is an individual that is

"experiencing a depressed mood" and "mild to moderate insomnia," but can still function—i.e., take care of herself and work. (*Id*. at 130:5-10).

88. Nelson did not bring Pawla with her to the interview with Dr. Hendricks. (*Id*. at 158:2-7). Therefore, Dr. Hendricks, who never saw Nelson interact with Pawla, could not say whether Pawla helped Nelson. (*Id*. at 158:8-22).

### G. Effect on Nelson of Examination with Dr. Hendricks

89. Following her examination with Dr. Hendricks, Nelson became "very upset," and felt "almost abused." (May 27, 2015 Tr. at 172:1-13). Nelson stayed in bed for two to three days. (*Id*. at 172:13-14). She was "mentally exhausted" and "very depressed." (*Id*. at 172:14-15).

90. During a March 27, 2013 visit with Dr. Brinker, Nelson told Dr. Brinker that she was suicidal after the interview with Dr. Hendricks. (May 28, 2015 Tr. at 91:13-19).

91. Dr. Brinker corroborated that Nelson was "devastated" by the interview with Dr. Hendricks and cried for three days afterwards. (*Id*. at 77:24-25; 78:1-3).

92. Dr. Hendricks was shocked that Nelson "felt abused" and was "very depressed" after the interview. (*Id*. at 122:8-18; 144:2-3). Dr. Hendricks felt no sense of discomfort or distress from Nelson during the interview. (*Id*. at 144:21-22). Dr. Hendricks attributed these statements from Nelson to malingering. (*Id*. at 145:7-9; 147:1).

### H. Request for Reasonable Accommodation

93. In a letter dated December 7, 2009, Long Reef advised Nelson that pets are not allowed at Long Reef, and that Pawla had to be removed from the premises. (May 27, 2015 Tr. at 124:12-18; May 28, 2015 Tr. at 174:18-25; Def. Ex. 7). The letter also stated that, if Pawla was not removed, Long Reef would "have no recourse except to proceed with

fines, followed by legal action[.]" (Def. Ex. 7).[17]

94.   In response, Nelson spoke with Anne Marie Bedell ("Bedell"), a member of the Board of Directors at Long Reef at the time, and informed Bedell that she needed a "service dog." (May 27, 2015 Tr. at 124:19-25; May 29, 2015 Tr. at 76:16-19). Nelson informed Bedell that she believed she had a right under federal law to keep Pawla at Long Reef. (May 27, 2015 Tr. at 124:23-25; 125:1-2).

95.   Nelson also explained to Bedell that "a lot of events," including the murder of her friend that she witnessed, "left [her] emotionally drained," and that Pawla "made [her] feel safe and gave [her] comfort." (May 29, 2015 Tr. at 76:16-21; 77:12-15).

96.   Nelson stated to Bedell that she hoped the Board could do something in light of the Board's position not to allow pets on the property. (*Id*. at 77:15-17).

97.   Johanna Renzi ("Renzi"), President of the Board of Directors at Long Reef, could not recall whether Bedell informed the Board about Nelson's request for a service animal. (May 28, 2015 Tr. at 200:11-14).

98.   On February 1, 2010, Long Reef charged Nelson a $25.00 "pet fine." Nelson was subsequently fined a $50.00 and a $75.00 "pet fine" on March 1, 2010 and April 1, 2010, respectively. (May 27, 2015 Tr. at 166:9-19; 167:1-12; Pl. Ex. 3; May 28, 2015 Tr. at

---

[17] Long Reef has the following policy for violations of the Rules and Regulations:

   a)   A written or verbal notification of the violation shall be given to the Homeowner.
   b)   $25 will be assessed if the homeowner is still in violation after 30 days of being notified.
   c)   $50 will be assessed if the homeowner is still in violation after 60 days of being notified.
   d)   $75 will be assessed if the homeowner is still in violation after 90 days of being notified.

   Thereafter, legal proceedings will be commenced and the homeowner will be responsible to pay any legal fees associated with this expense.

(Def. Ex. 2; *see also* May 28, 2015 Tr. at 171:23-25; 172:1-3, 12-25; 173:1).

216:14-17).[18]

99.  In a handwritten letter dated February 15, 2010, Nelson stated to Long Reef: "I do not elect to pay the pet fine. The 'pet' is a necessary companion. This should be discussed with all owners at the annual meeting." (Pl. Ex. 9).[19]

100.  Nelson delivered this letter to the then office manager at Long Reef, Leigh Ball ("Ball"). (May 27, 2016 Tr. at 127:1-10).

101.  Upon receipt of the February 15, 2010 letter, Ball informed Nelson that her request for a "pet" was not sufficient. (*Id*. at 127:15-20; 133:6-7).

102.  Nelson responded by asking Ball what documentation was needed to keep Pawla. (*Id*. at 133:7-10).

103.  Ball never explained to Nelson what type of documentation was needed. (*Id*. at 133:11-13).

104.  Renzi confirmed that the February 15, 2010 letter was received by Ball, who then passed it on to the Board of Directors. (May 28, 2015 Tr. at 174:9-17; 200:19-25; 201:1-3).

105.  In response to Nelson's February 15, 2010 letter, the Long Reef Board of Directors, as requested by Nelson, discussed the pet issue at its March 13, 2010 homeowners meeting. (*Id*. at 175:25; 176:1-7; 201:10-16). Nelson did not attend the March 2010 meeting. (*Id*. at 176:11-13). Instead, she submitted a proxy. (*Id*. at 176:14-17; Def. Ex. 19).

106.  During the meeting, Long Reef homeowners discussed the pros and cons of allowing animals on the property. (*Id*. at 177:7-10). Some homeowners decided to form a pet

---

[18] Although the fines were imposed in February, March, and April, they were, in fact, for the month prior—i.e., January, February, and March. (May 28, 2015 Tr. at 216:20-22).

[19] Nelson acknowledges that the handwritten letter does not state that she is requesting a service dog. (May 27, 2016 Tr. at 201:4-9, 18-20).

committee. (*Id*. at 177:10-11).

107. Renzi did not follow-up with Nelson after the March 2010 homeowners meeting about the discussion of the pet issue at the meeting. (*Id*. at 201:10-25). Renzi does not know if any other member of the Board followed up with Nelson. (*Id*. at 202:1-3).

108. In April 2010, the Long Reef Board of Directors consulted with its legal counsel about removing Nelson's dog from the property. (*Id*. at 179:16-19). Counsel, on behalf of Long Reef, then filed a complaint against Nelson in the Superior Court of the Virgin Islands. (*Id*. at 179:25; 180:1-8; 181:12-15; 202:4-8).[20]

109. Nelson paid $1,520.00 in attorney's fees for the Superior Court action. (May 27, 2015 Tr. at 165:2-16).

110. On June 3, 2010, Nelson sent a letter to the Long Reef Board of Directors, which stated, in relevant part:

> When it became necessary for me to have a service animal I was under the impression that Long Reef would approve it as animals have been a part of Long Reef since I bought there in 2004. Then I received my first fine, which I did not pay as I didn't feel I was breaking any rules. I made a statement in writing that I needed the animal and gave it to Leigh Ball, Office Manager. (She has the letter in my file in her office.) She stated that wasn't good enough, she needed more than that. I then said "Tell me what you need and I'll get it." That was never answered so I went no further, assuming by the notes from the Annual Homeowners Meeting that a pet committee was being formed and at least it would now be discussed.
>
> On May 21, 2010, a gentleman delivered a summons to my place of business. I then asked Leigh to read my statement to me because I forgot what I said, and it turns out I used the phrase "companion" when in fact I should have said "service companion." So an oversight on my part caused me to receive escalating fines and a lawsuit.

(Pl. Ex. 11; *see also* May 27, 2015 Tr. at 139:20-25; 140:1-4, 15-22).

---

[20] The Superior Court action against Nelson was dismissed by Long Reef and the claim for a declaratory judgment was reasserted as a counterclaim in the instant case. (May 28, 2015 Tr. at 186:24-25; 187:1-9).

111. Renzi acknowledged that the Board received Nelson's June 3, 2010 letter. (May 28, 2015 Tr. at 204:9-25). However, Long Reef did not respond to the letter. (May 27, 2015 Tr. at 141:1-4; May 28, 2015 Tr. at 205:1-7).

112. All documents received from Nelson, after Long Reef filed suit in the Superior Court, were referred by Long Reef to legal counsel. (May 28, 2015 Tr. at 206:2-8).

113. Renzi does not know if legal counsel ever responded to Nelson's June 3, 2010 letter. (*Id*. at 206:9-12).

114. On July 16, 2010, Nelson sent another letter to the Long Reef Board, which stated, in relevant part:

> I am the owner of Unit 17 at 3016 Estate Orange. I have received your notice of fines for pet violations, also a summons that was apparently dropped after I spoke to your attorney, Scott McChain. I am asking that you drop all fines and charges related to this issue.
>
> In October or November, 2009, it was my understanding there was a good possibility a pet policy would be put in place as Ann Marie Bedell, board member and Treasurer at the time, was trying to exercise her right to keep a pet. She also tried to exercise her right as a condo owner to get the board to recognize an owners [sic] right to amend the rules. All the board members asked for her resignation. . . .
>
> I turned in a letter to Leigh Ball stating that I had a need for an animal. She said that wasn't good enough, "they" needed more. I said, let me know what you need. That question was never answered. I did not turn in any documentation to the board as none was asked for. Then I was served a summons, long after I moved out. . . .
>
> As an owner I have a right to move in and out of Long Reef as I please. I also have the right to my service animal. I would like to know, specifically, what documentation Long Reef requires for the presence of this animal in the future.

(Pl. Ex. 12; *see also* May 27, 2015 Tr. at 141:5-25; 142:1-7).

115. Renzi acknowledged that Long Reef received Nelson's July 16, 2010 letter, but did not provide what specific documentation Long Reef required for a service animal. (May 28,

2015 Tr. at 206:13-23; 207:4-16; *see also* May 27, 2015 Tr. at 142:8-17). The letter was referred to legal counsel. (May 28, 2015 Tr. at 207:4-16).

116. Renzi does not know if legal counsel ever responded to Nelson's July 16, 2010 letter. (*Id.* at 206:9-12).

117. On August 11, 2010, Long Reef sent Nelson a letter with the subject line: "Response to Your Letter to Long Reef Board of Directors dated July 16, 2010." (Pl. Ex. 25). In the letter, Long Reef stated:

> The Board is in receipt of your letter to the Long Reef Board of Directors dated July 16, 2010. . . .
>
> The Board works cohesively with management to improve Long Reef's property and living conditions in the best interest of all homeowners and residents. Since Long Reef's rules do not allow pets and you continued to reside with your dog at Long Reef, fines were imposed followed by legal action. You are responsible to pay these fines and legal fees.
>
> If you wish to further correspond regarding this matter, you may do so through legal channels, however, this will incur additional legal fees in addition to what you now owe.

(*Id.*).

118. On December 1, 2010, Long Reef filed a "Notice of Lien" against Nelson's condominium unit at Long Reef in the amount of $1,308.15. (Pl. Ex. 13; *see also* May 28, 2015 Tr. at 219:3-11). The lien represented unpaid charges that "accrued as of December 1, 2010 together with all interest, costs and attorney's fees[.]" (Pl. Ex. 13).[21]

---

[21] Article V, Section 1 of the Long Reef Bylaws, entitled "Determination of Common Expenses and Fixing of Common Charges," provides that the Long Reef Board of Directors shall assess "common charges" for the "common expenses of the Condominium." (Def. Ex. 1). Article V, Section 6 further provides, in relevant part:

> In the event of default by any unit owner in paying to the Board of Directors the common charges as determined by the Board of Directors, such unit owner shall be obligated to pay interest at the legal rate on such common charges from the due date thereof, together with all expenses, including attorney's fees, incurred by the Board of Directors in any proceedings brought to collect such common charges. All such unpaid common charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code.

119. Nelson testified that when she received the "Notice of Lien," she "didn't understand why the lien was placed on [her unit]" and felt "stressed out." (May 27, 2015 Tr. at 144:14-25).

120. Nelson testified that she was also stressed about the imposition of attorney's fees. (*Id*. at 170:7-19).

121. On June 16, 2011, Long Reef released the lien against Nelson's condominium unit. (Def. Ex. 12; *see also* May 27, 2015 Tr. at 206:8-11). Nelson testified that she felt "much better" after the lien was released. (May 27, 2015 Tr. at 12-13).

122. The Court credits Nelson's testimony about the effect the lien and the imposition of attorney's fees had on her emotional state.

123. By letter, dated June 13, 2011, Nelson, through counsel, requested that Long Reef accommodate her request for an emotional support animal, stating:

> Please consider this correspondence a formal request that an accommodation to live with an Emotional Support Animal be made for Ms. Sandra Nelson under the United States Fair Housing Act. Arguably, Ms. Nelson's request by undated letter to the Board for a "service animal" would constitute a request under the Fair Housing Act. Ms. Leigh Ball told Ms. Nelson that the Board needed "more" than just her request, however, no request for information was ever made to Ms. Nelson. Ms. Nelson has been diagnosed with a mental impairment which substantially limits one or more of her major life activities, constituting a handicap under the Fair Housing Act. The accommodation of allowing Ms. Nelson to live with her Emotional Support Animal is necessary to afford her equal opportunity to use and enjoy her home.
>
> While Ms. Nelson no longer lives at Long Reef, she is entitled to this accommodation and would one day like to return to her home with her Emotional Support Animal. We believe this accommodation is reasonable. Ms. Nelson has no intention of letting her accommodation become a disruption to the Condominium Complex. In fact, she intends to comply with the proposed pet rules that Anne-Marie Bedell suggested in October

---

(*Id*.). On December 1, 2010, Nelson was not in default in payment of her common charges. (May 27, 2015 Tr. at 169:25, 170:1-6). The unpaid charges that were the subject of the December 1, 2010 lien were the unpaid pet fines that had accrued interest. (*Id*. at 169:14-24).

2009.

> I ask that you seriously consider this request for an accommodation for an Emotional Support Animal. A denial of this request will result in Ms. Nelson filing a complaint under the Federal Fair Housing Act.

(Pl. Ex. 15).

124. Despite receiving the June 13, 2011 letter, Long Reef did not respond. (May 28, 2015 Tr. at 209:1-25; 211:25; 212:1-5; May 27, 2015 Tr. at 145:16-18; 147:1-8). The letter was referred to legal counsel. (May 28, 2015 Tr. at 209:21-25).

125. Neither Long Reef, nor its legal counsel, ever responded to Nelson's request for an emotional support animal or told Nelson what documentation Long Reef required to support such a request. (*Id.* at 213:4-19; 215:3-11; May 27, 2015 Tr. at 173:10-18; May 29, 2015 Tr. at 18:13-25; 19:1-11).

126. According to Renzi, there would be no financial burden on Long Reef if Pawla lives on the premises. (May 29, 2015 Tr. at 29:23-25; 30:1-3). There would also be no fundamental alteration to the Long Reef premises if Pawla is allowed to live there. (*Id.* at 30:4-6).

## I.  Nelson Moves out of Long Reef

127. Nelson testified that she moved out of her condominium unit at Long Reef in February 2010 because she "didn't feel comfortable" and felt she was being "harassed" with "pet fines." (May 27, 2015 Tr. at 149:23-25; 150:1-5).[22]

128. In February 2010, Nelson also began remodeling her condominium unit. (*Id.* at 150:22-23; 201:25; 202:1-4). Specifically, Nelson remodeled and retiled the bathroom; painted

---

[22] Long Reef did not learn that Nelson moved out of her condo until it received her July 16, 2010 letter, in which Nelson stated: "Although I no longer reside at Long Reef I am still an owner . . . ." (May 28, 2015 Tr. at 180:12-25; 181:1; *see also* Pl. Ex. 12).

the walls; and installed new floor tiles, a kitchen counter, closet doors, mirrors, lights, and water heater. (*Id*. at 202:5-16). The renovations were completed in August 2010. (*Id*. at 202:20-23).

129. For part of the renovations, Nelson was unable to live in her unit. (*Id*. at 150:25; 151:1-6). There was, however, a period of time when the unit was habitable, but Nelson chose to live elsewhere because of the "fines and harassment at Long Reef." (*Id*. at 151:4-6, 13-19).

130. After Nelson moved out of her unit in February 2010 with Pawla, she initially stayed with friends for one month. (*Id*. at 151:24-25; 152:1). She did not pay rent but provided pet care for her friends. (*Id*. at 152:5-11).

131. Nelson then moved to Fountain Valley from April 2010 until October 2011. (*Id*. at 152:15-20; 153:3-5). She paid $400.00 per month in rent. (*Id*. at 152:21-23; 153:1-2).

132. Nelson next moved into a cottage in Christiansted, where she stayed from the end of October 2011 to the beginning of December 2011. (*Id*. at 153:19-25). She did not pay rent during that time period. (*Id*. at 154:1-3).

133. From December 2011 through August 2012, Nelson lived in another cottage, called American Rentals. (*Id*. at 154:4-6, 13-14). She paid $500.00 per month in rent and $70.00 per month for electricity. (*Id*. at 154:9-10; 158:2-4; Pl. Ex. 23, 32).

134. In August 2012, Nelson moved to Vista Mar. (May 27, 2015 Tr. at 155:2-8). She did not pay rent but did pay the electric bill, which was between $60.00 and $65.00 per month. (*Id*. at 155:9-11, 15-18). She also signed an I.O.U. for the $200.00 per month common area charges. (*Id*. at 155:11-14). Nelson moved out of Vista Mar in February 2013. (*Id*. at 155:21-25).

135. Following her move from Vista Mar, in February 2013, Nelson moved back into her unit at Long Reef because she was told, by her attorney, that she could return to her unit with Pawla. (*Id*. at 156:1-11; 179:15-25; 180:1). Nelson stayed at Long Reef until May 2013, which is when she moved to California to see her family and to find work. (*Id*. at 156:1-18).

136. Nelson plans to move back to Long Reef. (*Id*. at 156:21-22).

### J.   Rental of Nelson's Long Reef Condominium Unit

137. Beginning in January 2011, Nelson began renting her condominium unit at Long Reef to tenants. (*Id*. at 157:6-11). Her first tenant was Pieretter Spiegler, who rented the unit for six months. (*Id*. at 157:12-16; Pl. Ex. 27). Ms. Spiegler paid $650.00 per month, which included utilities. (May 27, 2015 Tr. at 157:19-21; Pl. Ex. 27).

138. In October 2011, Nelson rented her unit to Rene Bonet for two months. (*Id*. at 158:15-19; 159:8-9; Pl. Ex. 31). Mr. Bonet also paid $650.00 per month, which included utilities. (*Id*. at 158:20-24; Pl. Ex. 31).

139. The next tenant was Mike Wells, who rented Nelson's condominium unit for one month and paid $500.00, which included utilities. (*Id*. at 160:9-20).

140. The last tenants to live in Nelson's condominium were Mark and Stella Deamelia, who stayed in the unit for four months. (*Id*. at 160:21-25). The Deamelias agreed to pay $500.00 per month but Nelson received only $1,280.00 over the four-month period, which included utilities. (*Id*. at 161:1-9).

141. In total, Nelson incurred approximately $12,000.00 in out-of-pocket expenses during the period of time that she did not live at Long Reef—after subtracting the amount she received in rent from tenants. (*Id*. at 162:19-25; 163:1-8). Those expenses included the

cost of moving, driving further to work, and renting elsewhere. (*Id*. at 162:19-25; 163:1-14).

### K.  Requests by Others for Reasonable Accommodations

### Christina Walsh

142.  Cary Guilbeau, a homeowner at Long Reef, leases her condominium unit to tenants. (May 29, 2015 Tr. at 38:21-25; 39:1-7).

143.  In September 2013, Ms. Guilbeau informed Long Reef, in writing, that her tenant, Christina Walsh, wanted to move in to Long Reef in October 2013 with a small service dog. (*Id*. at 39:8-12, 40:6-9).

144.  Ms. Walsh provided Ms. Guilbeau with documentation regarding her service dog, including a service dog card, an identification card for the dog that had a photograph of the dog, and a letter from her doctor. (*Id*. at 40:10-14).

145.  Prior to sending the letter, Ms. Guilbeau sent an e-mail to the Long Reef manager at the time, Travis Holloway, advising him that she had looked through Long Reef's Rules and Regulations for an exception for service dogs, but did not see one. (*Id*. at 39:13-19, 25; 40:1-5).

146.  During a conversation with Mr. Holloway, Ms. Guilbeau was told that "there were some issues with service dogs." (*Id*. at 40:17-19). Upon learning this information, Ms. Guilbeau hired legal counsel and provided counsel with all of the documentation Ms. Walsh had for her service dog. (*Id*. at 40:19-20; 41:4-7). Legal counsel then contacted Long Reef. (*Id*. at 41:7-8).

147.  Based on the advice of legal counsel, Ms. Guilbeau allowed Ms. Walsh to move into her condominium unit at Long Reef in October 2013 with her service dog. (*Id*. at 41:9-14).

148. Through communication with Ms. Guilbeau's attorney, Long Reef requested to review Ms. Walsh's medical records. (*Id*. at 41:17-25, 42:1-5). Ms. Walsh was uncomfortable with this request. (*Id*. at 42:4-7). Therefore, she hired her own legal counsel. (*Id*. at 42:7).

149. There was a decision made by Ms. Walsh's attorney and Ms. Guilbeau's attorney that Long Reef could review Ms. Walsh's medical records pursuant to a confidentiality agreement. (*Id*. at 42:7-12). However, Long Reef never reviewed Ms. Walsh's medical records because the parties were unable to agree on the language in the confidentiality agreement. (*Id*. at 42:13-17).

150. Four months into her twelve-month rental agreement with Ms. Walsh, Ms. Guilbeau allowed Ms. Walsh to prematurely terminate the lease rather than incur additional legal fees. (*Id*. at 42:18-23).

151. Ms. Guilbeau never received any resolution to the service dog issue. (*Id*. at 43:6-13; 52:16-17).

**Richard Chiocco**

152. In a letter dated December 18, 2013, John and Suzan Wold, homeowners at Long Reef, notified Long Reef that their tenant, Richard Chiocco, is a disabled veteran and requires a service dog. (Pl. Ex. 37; May 29, 2015 Tr. at 14:24-25; 15:1-6; *see also* May 27, 2015 Tr. at 222:9-11).

153. Together with the letter, the Wolds provided Long Reef with a license number for the service dog and a signed letter from a doctor at the Veterans Administration ("VA"), which stated: "This letter is written on behalf of veteran Richard F. Chiocco []. Mr. Chiocco has been granted the use of a service dog due to a service connected condition/disability." (Pl. Ex. 36; May 29, 2015 Tr. at 13:19-25; 14:1-23).

154. In a response letter, dated January 9, 2014, Long Reef stated, in relevant part:

> It appears that you are requesting an accommodation to allow your tenant to have an animal in the Unit. Based on the copy of the statement from Dr. Ortiz, it is impossible for the Board to make a determination on the request. Please submit such additional documentation that will allow the Board to determine whether [Mr. Chiocco] is handicapped and, if so, whether the accommodation requested is reasonable and necessary."

(Pl. Ex. 38; May 29, 2015 Tr. at 15:7-16).

155. Mr. Chiocco was never informed that Long Reef requested additional documentation for his service animal. (May 27, 2015 Tr. at 224:17-20).

156. Before a decision was made on the Wolds' request, Mr. Chiocco moved out of Long Reef. (May 29, 2015 Tr. at 15:20-22).

157. In an e-mail, dated May 2, 2014, counsel for Long Reef reported to Renzi and the other Board members that "Richard Chiocco, the tenant in Unit #13 with the purported service animal" informed her that "he will be moving out on May 15th." (Pl. Ex. 38). The e-mail concluded by stating: "That seems to be the end of that." (Pl. Ex. 38; May 29, 2015 Tr. at 16:5-14).

### Robert Eldridge and Darcey Koslik

158. In a letter dated October 12, 2014, John and Suzan Wold notified Long Reef that their tenants, Robert Eldridge and Darcey Koslik, required a service dog. (May 29, 2015 Tr. at 9:4-16; Pl. Ex. 19).

159. The letter was accompanied by a certificate entitled "Emotional Support Dog" and an identification badge for an emotional support dog. (Pl. Ex. 19; May 29, 2015 Tr. at 9:17-25; 10:1).

160. Long Reef responded to the Wolds' request for a service animal by letter, dated October 27, 2014, wherein Long Reef requested additional documentation "to establish that [Ms.

Koslik] suffers from a disability and that the accommodation is necessary for the treatment of that disability." (Pl. Ex. 20; May 29, 2015 Tr. at 10:14-24).

161. By separate notice, also dated October 27, 2014, Long Reef informed the Wolds that they were in violation of the Long Reef "no pets" policy. (Pl. Ex. 21; May 29, 2015 Tr. at 11:4-25; 12:1-25). The notice stated, in relevant part:

> Tenants in possession of a dog have occupied unit #13 without proper documentation and with no accommodation by the Board of Directors. Before anyone with an animal is allowed to occupy a unit at Long Reef, proper documentation must be provided to the Board of Directors and a special accommodation must be granted. Your unit is therefor [sic] currently in violation of the Long Reef no pet policy.
>
> To avoid penalties spelled out in said Rules and Regulations listed below, the situation should be rectified within **30 days** of this notification.

(Pl. Ex. 21 (emphasis in original)). The notice set forth the applicable fine schedule. (*Id.*).

162. Robert Eldridge and Darcey Koslik moved out of Long Reef before fines were imposed on the Wolds. (May 29, 2015 Tr. at 13:7-18).

## II.    CONCLUSIONS OF LAW AND LEGAL ANALYSIS

### A.  The Fair Housing Act

1. Under the Fair Housing Act ("FHA"), passed by Congress as Title VIII of the Civil Rights Act of 1968, it is unlawful to refuse to sell, rent, or otherwise make unavailable "a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).[23]

2. "Congress amended the FHA in 1988 to expand its protections from housing discrimination to persons with disabilities." *Fair Hous. Rights Ctr. v. Post Goldtex GP,*

---

[23] A dwelling is defined under the FHA as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b); *see also Lakeside Resort Enters., LP v. Bd. of Supervisors,* 455 F.3d 154, 156 (3d Cir. 2006).

*LLC*, 2016 U.S. App. LEXIS 8985, at *5 n.3 (3d Cir. Pa. May 17, 2016); *see also* Fair Housing Amendments Act of 1988 ("FHAA"), Pub. L. No. 100-430, 102 Stat. 1619 (codified at 42 U.S.C. §§ 3610 *et seq*.).

3.    Under § 3604 of the FHA, a plaintiff "may bring three general types of claims: (1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make 'reasonable accommodations,' which arise under § 3604(f)(3)(B)." *Cmty. Srvs. v. Wind Gap Mut. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005) (citing *Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of Twp. of South Plains*, 284 F.3d 442, 448 n.3 (3d Cir. 2002)).

4.    In the instant case, Nelson claims that Long Reef violated the reasonable accommodations provision of the FHA by failing to respond to her request for an exception to its "no pets" policy due to her disability.

5.    Nelson also claims that Long Reef violated the disparate treatment provision of the FHA when it ignored her requests for a reasonable accommodation to the "no pets" policy and failed to identify the documentation necessary for such a request.

6.    Long Reef counters that it is not liable under the FHA because Nelson failed to provide adequate information to support her request for a reasonable accommodation.

**B.  Reasonable Accommodations under the FHA**

7.    As amended, the FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. §

3604(f)(2).[24]

8.   Such discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a] person [with a disability] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); *see also* 24 C.F.R. § 100.204(a).

9.   To prevail on a failure to accommodate claim, a plaintiff must prove that (1) she is disabled within the meaning of the FHA; (2) she requested a reasonable accommodation; (3) the requested accommodation was necessary to afford her an opportunity to use and enjoy her dwelling; and (4) defendant refused to make the accommodation. *See Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285 (11th Cir. 2014); *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 (6th Cir. 2011).[25]

10.  The FHA defines disability as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).

11.  The term "physical or mental impairment" includes, but is not limited to, any mental or psychological disorder, such as "emotional or mental illness." 24 C.F.R. § 100.201(a)(2).

12.  The term "substantially limits" suggests "'considerable' or 'to a large degree,'" but a plaintiff need not prove that she suffers from "'utter inabilities.'" *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (quoting *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 197 (2002); *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998)).

---

[24] The terms "handicap" and "disability" both have the same legal meaning. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). Therefore, the Court will use the terms interchangeably.

[25] The Third Circuit has not yet articulated a "clear standard for reasonable accommodation claims under the FHA." *Bedell v. Long Reef Condo. Homeowners Ass'n*, 2013 U.S Dist. LEXIS 172031, at *17 (D.V.I. Dec. 6, 2013); *see also Schoenstein v. Constable*, 2014 U.S. Dist. LEXIS 165508, at *24 (D.N.J. Nov. 26, 2014).

13. The term "major life activity" means an activity that is "of central importance to daily life," *Toyota Motor Mfg.*, 534 U.S. at 197, such as "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working," 29 C.F.R. § 1630.2(i); *see also* 24 C.F.R. § 100.201(b).

14. The Supreme Court has ruled that "working" is a major life activity only if the claimant can show an inability to work in a "broad range of jobs" rather than a specific job. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 492 (1999); *see also Bhogaita*, 765 F.3d at 1288 (noting that the Supreme Court has "concluded that an impairment substantially limits one's ability to work only where it renders a person 'unable to work in a broad class of jobs'") (quoting *Sutton*, 527 U.S. at 491).

15. The phrase "a record of having such an impairment" means that the person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 24 C.F.R. § 100.201(c).

16. In the context of the Americans with Disabilities Act ("ADA"), which defines a disability the same way the FHA defines a handicap, "a plaintiff only needs to show that at some point in the past he had a substantially limiting impairment" to establish a record of having a disability. *Spence v. Donahoe*, 515 F. App'x 561, 570 (6th Cir. 2013) (citation and internal quotation marks omitted).

17. "[T]o establish a statutorily protected disability, the [plaintiff] must show that she has an impairment; identify the life activity that she claims is limited by the impairment; and

prove that the limitation is substantial." *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 382 (3d Cir. 2004) (citing *Bragdon*, 524 U.S. at 631).

18. The determination of "whether a plaintiff's impairment substantially limits a major life activity," and thus whether the plaintiff is disabled, is made on a case-by-case basis. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999)).

19. A "reasonable accommodation" under the FHA has been defined as "a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling," including public and common use spaces. *Book v. Hunter*, 2013 U.S. Dist. LEXIS 39869, at *8 (D. Or. Mar. 21, 2013) (citation omitted).

20. Under § 3604(f)(3)(B) of the FHA, "the plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling, at which point the burden shifts to the defendant to show that the requested accommodation is unreasonable." *Lapid-Laurel*, 284 F.3d at 457.

21. To show that a requested accommodation is "necessary," a plaintiff "must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Id.* at 460 (quoting *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996) (internal quotation marks omitted)).

22. The "necessary" element, in other words, imposes a causation requirement on the plaintiff to demonstrate "a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person." *Id.* (quoting *Bryant*

*Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 604 (4th Cir. 1997) (internal quotation marks omitted)).

23.   "[I]f the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be "'necessary.'" *Id.* (quoting *Bryant Woods Inn*, 124 F.3d at 604 (internal quotation marks omitted)).

24.   To "establish that the accommodation proffered by [the plaintiff] was not reasonable, [the defendant] is required to prove that it could not have granted the variance without: (1) 'imposing undue financial and administrative burdens'; (2) 'imposing an 'undue hardship''; or (3) "requiring a fundamental alteration in the nature of the [defendant's housing services]." *Id.* at 462 (quoting *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1104 (3d Cir. 1996)).

25.   Reasonable accommodation requests must be reviewed "'in light of two countervailing legislative concerns: (1) effectuation of the statute's objectives of assisting the handicapped; and (2) the need to impose reasonable boundaries in accomplishing this purpose.'" *Id.* (quoting *Hovsons*, 89 F.3d at 1104).

26.   "An individual making a reasonable accommodation request does not need to mention the [FHA] or use the words 'reasonable accommodation.' However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability." *Boston Hous. Auth. v. Bridgewaters*, 452 Mass. 833, 848 (Mass. 2009).; *see also Kromenhoek v. Cowpet Bay W. Condo. Ass'n*, 77 F. Supp. 3d 462, 471 (D.V.I. 2014) ("A request for an accommodation must be reasonably specific.").

27. A reasonable accommodation request can be made orally or in writing. *Arnal v. Aspen View Condo. Ass'n*, 2016 U.S. Dist. LEXIS 24523, at *8 (D. Colo. Feb. 29, 2016) (citation omitted).

28. Although an individual making a reasonable accommodation request need not employ "magic words," the law is clear that "the duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (quoting *Prindable v. Ass'n of Apt. Owners*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003), *aff'd sub nom. DuBois v. Ass'n of Apt. Owners*, 453 F.3d 1175 (9th Cir. 2005))).

29. A housing provider is entitled to "'an opportunity to make a final decision . . ., which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law.'" *Id*. (quoting *Prindable*, 304 F. Supp. 2d at 1258).

30. For example, "in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the [FHA's] definition of disability [(i.e., has a physical or mental impairment that substantially limits one or more major life activities)]; (2) describes the needed accommodation; and (3) shows the relationship between the person's disability and the need for the requested accommodation." *Overlook*, 415 F. App'x at 621 (internal quotation marks and citation omitted)).

31. The meaningful review conducted by the housing provider "need not be highly intrusive." *Overlook*, 415 F. App'x at 621.

35

32. "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry." *Id*. at 621-22 (internal quotation marks and citation omitted).

33. Information verifying that the person meets the FHA's definition of disability can usually be provided by the individual himself or herself (e.g., a credible statement by the individual). *See Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 148, 157 (2d Cir. 2014) (explaining that an individual's testimony about his depression was competent to put his disability status in issue).

34. A doctor, other medical professional, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability. *See Castillo Condo. Ass'n v. United States HUD*, 821 F.3d 92, 99 (1st Cir. 2016).

35. The FHA does not require any formal procedures for reasonable accommodation requests. *See Arnal*, 2016 U.S. Dist. LEXIS 24523, at *7-8. However, "having formal procedures may aid individuals with disabilities in making requests for reasonable accommodations and may aid housing providers in assessing those requests so that there are no misunderstandings as to the nature of the request, and, in the event of later disputes, provide records to show that the requests received proper consideration." *Id*. (internal quotation marks and citation omitted).

36. Denial of a reasonable accommodation request can be "actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000); *see also Bhogaita*, 765 F.3d at 1286 (finding landlord's failure to make a decision on whether to accommodate emotional support animal for over six months constituted a constructive denial); *Overlook*, 415 F.

App'x at 622 (stating that "a housing provider that refuses to make a decision . . . could be found to have constructively denied the request by 'stonewalling' and short-circuiting the [interactive] process").

37.    "[A] housing provider has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation." *Overlook*, 415 F. App'x at 621 (internal quotation marks and citation omitted).

### C.  Nelson is Handicapped Within the Meaning of the FHA

38.    There is ample evidence in the record that Nelson is handicapped within the meaning of the FHA, in that her anxiety disorder and depression substantially limit a number of her major life activities. *See* 42 U.S.C. § 3602(h).

39.    Nelson was diagnosed, to a reasonable degree of medical certainty, by her primary care physician, Dr. Prasad, with an anxiety disorder; prescribed Xanax, an anti-anxiety medication; and referred to Dr. Brinker, a licensed clinical social worker. (May 27, 2015 Tr. at 106:14-16; May 28, 2015 Tr. at 15:16-25; 16:3-4; 28:11-25; 31:18-22; 37:17-21; 40:19-25; 64:5-7; Pl. Ex. 1, 2, 18).

40.    Dr. Brinker, who has diagnosed many people with severe depression and post-traumatic stress disorder, determined, based on her evaluation of Nelson, that Nelson was "severely depressed," and that she needed an antidepressant to improve her mood. (May 28, 2015 Tr. at 43:1-8; 63:2-13; 64:4-13).

41.    Dr. Brinker also affirmed, as reflected in the January 21, 2011 letter to Juan Figueroa Serville at Americans with Disabilities, that Nelson sought counseling "because she was suffering from severe depression." (*Id*. at 50:4-15; Pl. Ex. 14).

42.  Nelson testified that her anxiety and depression limits her ability to sleep, concentrate, work, communicate, and interact with others. (May 27, 2015 Tr. at 86:17-25; 87:11-14, 17-23; 88:5-25; 89:1-10; 113:17-21; 114:12-17). She also testified that she suffers from panic attacks, and continues to receive treatment for her panic attacks. (*Id.* at 87:11-14, 17-23; 113:17-21; 114:12-17).

43.  The testimony of Nelson, substantiated by her medical and prescription records and the testimony of Dr. Prasad and Dr. Brinker support the conclusion that Nelson suffers from an anxiety disorder and depression, and that these mental impairments substantially limit her ability to sleep, concentrate, communicate, and interact with others. *See* 29 C.F.R. § 1630.2(i); *see also* 24 C.F.R. § 100.201(b).[26]

44.  The testimony of Dr. Hendricks, a psychiatric expert retained by Long Reef, does not alter the Court's conclusion that Nelson is disabled within the meaning of the FHA.

45.  Although Dr. Hendricks did not see any signs of post-traumatic stress disorder at the time of his mental status examination of Nelson on January 10, 2013, he acknowledged that between 2009 and 2012, Nelson's inability to work at her store, get up, or leave her condominium unit was consistent with post-traumatic stress disorder. (May 28, 2015 Tr. at 152:1-14). He also stated that, "in the context of the things that had happened to her," he could understand if she had experienced post-traumatic stress disorder. (*Id.* at 126:11-19; 148:24-25; 149:1-7, 13-25; 150:1-8).

46.  As it pertains to post-traumatic stress disorder, Dr. Hendricks' clinical impression of Nelson was that she had post-traumatic stress disorder by history, but that it was in

---

[26] The record evidence does not support a conclusion that Nelson is unable to work in a "broad range of jobs." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 492 (1999). Thus, working is not one of the major life activities which has been substantially limited so as to render Nelson disabled.

remission. (*Id*. at 126:6-7; 150:9-15). He did not have an opinion on whether Nelson's post-traumatic stress disorder would return. (*Id*. at 150:16-20).

47.   At a minimum, then, Dr. Hendricks' testimony—based on his examination of Nelson on January 10, 2013—is consistent with the conclusion that Nelson had a disability by history. *See* 24 C.F.R. § 100.201(c) (explaining that the phrase "a record of having such an impairment," 42 U.S.C. § 3602(h)(2), means that the person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities").

48.   Although Dr. Hendricks explained that "by history" meant "what was stated to [him]" and "what [he] read," he also confirmed that the traumatic events in Nelson's life in 2009 were not only of such a nature that he could understand if she experienced post-traumatic stress disorder, but that her symptoms between 2009 and 2012 were consistent with that disorder. (May 28, 2015 Tr. at 126:11-19; 152:1-14).

49.   The Court acknowledges that Dr. Hendricks ultimately opined, to a reasonable degree of psychiatric certainty, that Nelson does not have a mental or psychiatric disorder that limits one or more of her major life activities. (*Id*. at 133:9-25; 134:1-8; 145:22-25). However, given that Dr. Hendricks' seventy-five-minute examination of Nelson on January 10, 2013 can only provide a "snapshot" of her mind at a particular point in time (*see id*. at 119:14-15), the Court does not credit Dr. Hendricks' testimony over the testimony of Dr. Prasad and Dr. Brinker, who both treated Nelson over the course of several years and strongly affirmed in February and April 2013, respectively, that Nelson suffers from an anxiety disorder and depression (*see id*. at 15:5-25; 16:3-4; 80:11-25; 81:1-25; 82:1-14).

50.   The Court further credits Nelson's testimony regarding the impact of her disorders on the performance of major life activities. *See Olsen*, 759 F.3d at 157 (crediting individual's testimony about his depression).

51.   Accordingly, the Court concludes that Nelson suffers from an anxiety disorder and depression; that these mental impairments substantially limit Nelson's ability to sleep, concentrate, communicate, and interact with others; and that Nelson is therefore handicapped within the meaning of the FHA.

### D.  Nelson Requested a Reasonable Accommodation

52.   The uncontroverted evidence establishes that Nelson requested a reasonable accommodation from Long Reef by requesting that she be exempted from the "no pets" policy, and that she be allowed to live at Long Reef with her emotional support animal, Pawla.

53.   An accommodation is reasonable under the FHA when it imposes no undue financial and administrative burdens nor fundamentally alters the nature of the housing program. *See Lapid Laurel*, 284 F.3d at 462.

54.   "In most circumstances, waiving a no-pet rule to allow a disabled resident the assistance of a service animal is a reasonable accommodation." *Prindable*, 304 F. Supp. 2d at 1257 (citing cases).[27]

---

[27] Section 100.204 of the "Regulations Relating to Housing and Urban Development" provides the following example of a reasonable accommodation to a "no pets" policy:

> A blind applicant for rental housing wants to live in a dwelling unit with a seeing eye dog. The building has a no pets policy. It is a violation of § 100.204 for the owner or manager of the apartment complex to refuse to permit the applicant to live in the apartment with a seeing eye dog because, without the seeing eye dog, the blind person will not have an equal opportunity to use and enjoy a dwelling.

24 C.F.R. § 100.204(b).

55.   The Department of Housing and Urban Development ("HUD"), the agency responsible

for enforcing the FHA, has stated:

> An assistance animal is not a pet. It is an animal that works, provides
> assistance, or performs tasks for the benefit of a person with a disability, or
> provides emotional support that alleviates one or more identified symptoms
> or effects of a person's disability. Assistance animals perform many
> disability-related functions, including[,] but not limited to, . . . providing
> emotional support to persons with disabilities who have a disability-related
> need for such support.

FHEO Notice (FHEO-2013-01 at 2).[28] HUD takes the position that "animals necessary

as a reasonable accommodation do not necessarily need to have specialized training.

Some animals perform tasks that require training, and others provide assistance that does

not require training." *See* Pet Ownership for the Elderly and Persons with Disabilities, 73

F.R. 63834-38 (October 27, 2008).

56.   By at least December 7, 2009, Long Reef was aware that Nelson had a dog on the Long

Reef premises, and warned her by letter that the dog had to be removed from the premises

or it would "have no recourse except to proceed with fines, followed by legal action[.]"

(Def. Ex. 7; May 28, 2015 Tr. at 174:18-25; 175:1-2).

57.   In an effort to have Long Reef reconsider its "no pets" policy, Nelson wrote to the Long

Reef Board on February 15, 2010, informing them that her "'pet' is a necessary

companion," and requesting that the pet issue be discussed at "the annual meeting." (May

27, 2015 Tr. at 127:1-14; Pl. Ex. 9).

58.   Nelson gave the February 15, 2010 letter to Leigh Ball, the then office manager at Long

Reef, who passed it on to the Board of Directors. (May 27, 2016 Tr. at 127:1-10; May

---

[28] HUD issued the FHEO ("Fair Housing and Equal Opportunity") Notice on April 25, 2013. The Notice provides
guidance on service animals and assistance animals for people with disabilities in housing and HUD-funded programs.
The FHEO Notice does not bind the Court, but the Court deems it instructive.

28, 2015 Tr. at 174:9-17; 200:19-25; 201:1-3).

59.   At the time of receipt, Ms. Ball informed Nelson that that her request for a "pet" was not
      sufficient. (May 27, 2015 Tr. at 127:15-20; 133:6-7). Although Nelson asked Ms. Ball
      what documentation was needed to keep Pawla, Ms. Ball never explained to Nelson what
      was required by Long Reef. (*Id*. at 133:7-13).

60.   As Nelson requested, the pet issue was discussed at the March 13, 2010 homeowners
      meeting. (May 28, 2015 Tr. at 175:25; 176:1-7; 201:10-16). However, Nelson did not
      attend the March 2010 meeting. (*Id*. at 176:11-13). Despite acknowledging that Nelson
      was not at the March 2010 meeting, no one from the Long Reef Board of Directors
      followed-up with Nelson about the discussion of the pet issue at the meeting. (*Id*. at
      201:10-25; 202:1-3).

61.   Less than four months later, on June 3, 2010, Nelson again wrote to the Long Reef Board,
      informing them of her need for a "service animal," and that she had previously inquired
      about the documentation required to have an animal on the Long Reef property, but did
      not receive an answer. (May 27, 2015 Tr. at 139:20-25; 140:1-4, 15-22; Pl. Ex. 11). The
      Long Reef Board received the June 3, 2010 letter, but did not respond. (May 28, 2015
      Tr. at 204:9-25; 205:1-7; May 27, 2015 Tr. at 141:1-4).

62.   Shortly thereafter, on July 16, 2010, Nelson again requested by letter "what
      documentation Long Reef requires" for service animals. (May 27, 2015 Tr. at 141:16-
      25; 142:1-7; Pl. Ex. 12). The Long Reef Board received the July 16, 2010 letter, but did
      not respond to Nelson's request. (May 28, 2015 Tr. at 206:13-23; 207:4-16; *see also* May
      27, 2015 Tr. at 142:8-17).

63.  Instead of identifying the documentation that Long Reef required for a service animal, Long Reef sent Nelson a letter, dated August 11, 2010, informing her that she was responsible for the pet fines imposed against her condominium unit for violating the "no pets" policy and for the legal fees incurred by Long Reef in connection therewith. (May 28, 2015 Tr. at 208:1-25; Pl. Ex. 25).

64.  By letter dated June 13, 2011, Nelson formally requested, through counsel, a reasonable accommodation for her disability. (May 27, 2015 Tr. at 146:24-25; 147:1-5; Pl. Ex. 15). The letter stated that Nelson suffered from a "mental impairment which substantially limits one or more of her major life activities," and that the requested accommodation to live in her condominium unit with an emotional support animal "is necessary to afford her equal opportunity to use and enjoy her home." (*Id.*).

65.  Long Reef received the June 13, 2011 letter, but did not respond. (May 28, 2015 Tr. at 209:1-25; 211:25; 212:1-5; May 27, 2015 Tr. at 145:16-18; 147:1-8).

66.  Accordingly, Long Reef had notice by June 13, 2011, at the latest, that Nelson claimed that she suffered from a "mental impairment which substantially limits one or more of her major life activities," and that she was requesting an accommodation to live in her condominium unit with an emotional support animal. (Pl. Ex. 15). Although devoid of the precise legal language, Nelson made reasonable attempts to engage Long Reef on the issue from over one year earlier. (May 27, 2015 Tr. at 127:1-14; 139:20-25; 140:1-4, 15-22; 141:16-25; 142:1-7; Pl. Ex. 9, 11, 12); *see also Book v. Hunter*, 2013 U.S. Dist. LEXIS 39869, at *10 (D. Or. Mar. 21, 2013) ("Under the FHA, a resident . . . makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or

service because of her disability.").

67. In addition to acknowledging that Long Reef had received Nelson's various communications, Renzi, President of the Board of Directors at Long Reef, concedes that allowing Nelson to keep Pawla in her condominium unit at Long Reef would not impose an undue financial burden on Long Reef nor fundamentally alter the housing services Long Reef provides. (May 28, 2015 Tr. at 213:4-19; May 29, 2015 Tr. at 29:23-25; 30:1-6).

68. Based on the foregoing evidence, the Court concludes that Nelson requested a reasonable accommodation for her handicap from Long Reef in the form of an exception to the "no pets" policy.

### E. The Requested Accommodation was Necessary to Afford Nelson an Equal Opportunity to Use and Enjoy her Dwelling

69. Nelson produced sufficient evidence that the requested accommodation of keeping Pawla in her condominium unit at Long Reef was necessary for her to use and enjoy her dwelling. The Court therefore finds that Nelson has satisfied this requirement.

70. Nelson testified that Pawla alleviated the effects of her disability by providing her with "comfort"; bringing her out of "depressed states of mind"; helping her to cope with her panic attacks and nightmares; and making her "feel safe" again. (May 27, 2015 Tr. at 118:1-3; 9-13, 25; 119:1-12, 25; 120:1).

71. Nelson's testimony was corroborated by Dr. Prasad and Dr. Brinker. Dr. Prasad testified about a letter he wrote, wherein he stated that Pawla "has helped [Nelson] therapeutically for her [anxiety] condition," and that "[a]s her primary care physician [he] strongly recommend[s] that she continue to keep her dog which has been a vital support for her psychologically." (Pl. Ex. 18).

72. Dr. Brinker, who personally observed the bond between Nelson and her dog, similarly testified about a letter that she wrote, which stated that Pawla "gave [Nelson] comfort" and "a sense of safety," and that it is her recommendation that Nelson have Pawla "for safety and companionship." (May 28, 2015 Tr. at 47:3-9; 50:4-9, 13-15; Pl. Ex. 14).

73. Dr. Brinker also testified that it is her professional opinion that Pawla is a "necessary emotional support dog" for Nelson. (May 28, 2015 Tr. at 52:10-12). Nelson's situation is only one of three (among many) where Dr. Brinker has seen a "genuine need for a therapy dog" and has advocated accordingly. (*Id.* at 48:4-7; 50:16-20).

74. In Dr. Hendricks' opinion, Nelson does not need an emotional support animal as part of her treatment. (*Id.* at 133:23-25; 134:1). Because Nelson did not bring Pawla with her to the interview with Dr. Hendricks, Dr. Hendricks never saw Nelson interact with Pawla, and, therefore, could not opine on whether Pawla helped Nelson. (*Id.* at 158:2-23).

75. Nelson's testimony, corroborated by the letters and testimony of Dr. Prasad and Dr. Brinker, support the conclusion that the requested "accommodation was necessary to afford [Nelson] an opportunity to use and enjoy [her] dwelling" (42 U.S.C. § 3604(f)(3)(B)), and the Court so finds.

### F. Long Reef Constructively Denied Nelson's Request for an Accommodation

76. Long Reef never responded to Nelson's request for a reasonable accommodation. (May 28, 2015 Tr. at 209:1-25; 211:25; 212:1-5; May 27, 2015 Tr. at 145:16-18; 147:1-8).

77. It is undisputed that Long Reef did not: (1) respond to Nelson's repeated requests to identify the documentation required by Long Reef for her to have a service animal; (2) request documentation from Nelson that supported her request for an exception to the "no pets" policy; or (3) engage in an "interactive process" with Nelson, as required by

the FHA. *See Jankowski Lee & Associates v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996).

78. By failing to engage in an "interactive process," Nelson was unable to ascertain what information Long Reef considered satisfactory for her reasonable accommodation request. (May 29, 2015 Tr. at 29:18-22).

79. Long Reef's refusal to respond to Nelson's inquiries and engage in an interactive process with her compelled Nelson to move out in order to keep her emotional support dog. (May 27, 2015 Tr. at 149:23-25; 150:1-5).

80. According to Nelson, she moved out of her condominium unit because she was left in the untenable position of choosing between keeping Pawla and enduring the "fines and harassment at Long Reef." (*Id*. at 151:4-6, 13-19).[29]

81. If Long Reef was skeptical about Nelson's disability, it was "incumbent upon" Long Reef "to request documentation or open a dialogue" with Nelson. *Jankowski*, 91 F.3d at 895; *see also* FHEO Notice at 3 ("A housing provider may not deny a reasonable accommodation request because he or she is uncertain whether or not the person seeking the accommodation has a disability or a disability-related need for an assistance animal.").

82. Instead of engaging in an interactive process, Long Reef ignored Nelson's requests for information, imposed fines on her for violating the "no pets" policy, and sued her in the Superior Court of the Virgin Islands for a declaratory judgment that she was in violation of the "no pets" policy and could not keep Pawla on the premises. (May 28, 2015 Tr. at

---

[29] Defendant contends that Nelson moved out of her condominium unit because she hired contractors to perform extensive renovations on her unit. (*See* May 27, 2015 Tr. at 202:5-19). However, while it is undisputed that renovations were made to Nelson's unit during her absence, the Court finds it significant that Nelson did not move back into her condominium unit when it became habitable during the renovations or immediately after the renovations were complete. Rather, Nelson moved back to her unit only after she was advised by her counsel that she could return with Pawla. (May 27, 2015 Tr. at 156:1-11; 179:15-25; 180:1).

179:25; 180:1-8; 181:12-15; 202:4-8).

83. Long Reef's failure to respond to Nelson's repeated requests for information amounted to a constructive denial of her request for an accommodation. *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1286 (11th Cir. 2014) (finding landlord's failure to make a decision on whether to accommodate emotional support animal for over six months constituted a constructive denial); *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 622 (6th Cir. 2011) (stating that "a housing provider that refuses to make a decision . . . could be found to have constructively denied the request by 'stonewalling' and short-circuiting the [interactive] process"). Accordingly, the Court concludes that Long Reef effectively denied Nelson's request for a reasonable accommodation.

## G. Long Reef Violated the Reasonable Accommodations Provision of the FHA

84. Based on the foregoing, the Court finds that Nelson suffered from a disability within the meaning of the FHA; Nelson requested that Long Reef allow her to keep an emotional support dog in her condominium unit as an accommodation for her disability; the requested accommodation was necessary for Nelson to use and enjoy her dwelling; and Long Reef constructively denied the requested accommodation by failing to engage in the required "interactive process" to determine if the request was reasonable and necessary.

85. The Court concludes that Long Reef's failure to respond to Nelson's requests for information, to ask Nelson for further documentation of her disability, or to engage in a dialogue with her about her requested accommodation to keep an emotional support dog in her condominium unit violated § 3604(f)(3)(B) of the FHA.

### H.  Declaratory Judgment

86.  Long Reef has asserted a counterclaim seeking a declaratory judgment that directs Nelson not to return to Long Reef with her dog, Pawla. (Dkt. No. 43 at 8).

87.  Under the Declaratory Judgment Act, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

88.  The Declaratory Judgment Act was enacted to "clarify legal relationships so that plaintiffs (and possibly defendants) [can] make responsible decisions about the future." *Surrick v. Killion*, 449 F.3d 520, 529 (3d Cir. 2006) (quoting *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 649 (3d Cir. 1990) (internal quotation marks omitted)).

89.  Based on the reasoning above and the Court's conclusion that Nelson has established that she was entitled to a reasonable accommodation under the FHA, which Long Reef constructively denied, the Court finds that Long Reef cannot show that it was not required to make the requested accommodation.

90.  Accordingly, the relief requested by Long Reef in its counterclaim for a declaratory judgment will be denied; the counterclaim will be dismissed; and Nelson will be permitted to return to Long Reef with Pawla.

### I.  Disparate Treatment under the FHA

91.  To prevail on a disparate treatment claim, a plaintiff must prove that the defendant acted with "discriminatory purpose," and that such purpose was a "motivating factor" for the challenged action. *Cmty. Srvs. v. Wind Gap Mut. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005).

92. "The discriminatory purpose need not be malicious or invidious, nor need it figure in 'solely, primarily, or even predominantly' into the motivation behind the challenged action." *Id.* at 177 (quoting *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)); *see also Horizon House Developmental Servs., Inc. v. Upper Southampton*, 804 F. Supp. 683, 696 (E.D. Pa. 1992) ("In order to prove intentional discrimination it is not necessary to show an evil or hostile motive. It is a violation of the [FHA] to discriminate even if the motive was benign or paternalistic.").

93. The plaintiff need only "show that a protected characteristic played a role in the defendant's decision to treat her differently." *Id.* (quoting *Cmty. Hous. Trust*, 257 F. Supp. 2d at 225).

94. In the context of a disparate treatment claim under the FHA, "the most fundamental element of the claim is that . . . [the] defendant's alleged discrimination was 'because of a [disability].'" *Id.* at 178 (quoting 42 U.S.C. § 3604(f)(2)).

95. Here, there is no evidence in the record that the enactment of the "no pets" policy at Long Reef was motivated by discriminatory animus, or that Long Reef enforced the "no pets" policy against Nelson because of her disability. Rather, the evidence indicates that the "no pets" policy was a general policy, which—with only a couple specified exceptions— was enforced against all homeowners and tenants subject to the Long Reef Rules and Regulations.

96. Nelson attempts to seize upon the exceptions to Long Reef's "no pets" policy to support her disparate treatment claim. Specifically, Long Reef "grandfathered-in" two cats that were not emotional support animals, and attempted to "grandfather-in" two dogs.

97.  As Nelson acknowledges, although Long Reef revised its "no pets" policy to "grandfather-in" two cats that were not emotional support animals, the attempt to "grandfather-in" two dogs that were also not emotional support animals failed. (*See* May 28, 2015 Tr. at 169:9-13, 17-25; 170:1-16).

98.  Renzi, President of the Board of Directors at Long Reef, testified that the reason the two cats were "grandfathered-in" to the "no pets" policy was because they had been on the Long Reef property for "a while." (May 28, 2015 Tr. at 169:9-13). The same was not true of the two dogs. (*See id*. at 169:17-25; 170:1-3).

99.  Long Reef's refusal to "grandfather-in" the two dogs because they did not satisfy the criteria used for the "grandfathering-in" of the two cats lends credence to the exception that was made for the cats.

100.  Further, the fact that the two dogs that were not "grandfathered-in" were not emotional support animals, or otherwise associated with a claimed disability, belies Nelson's contention that Long Reef's failure to allow Pawla to reside on the property was due to discriminatory animus based on her disability. Thus, the Court rejects Nelson's argument that the exceptions made by Long Reef to the "no pets" policy support the validity of her disparate treatment claim.

101.  Nelson also asserts that Long Reef has a pattern of discriminating against reasonable accommodation requests, and placing insurmountable barriers on those who request accommodations for support animals.

102.  However, the evidence of requests by others for reasonable accommodations does not support Nelson's claim.

103. The record evidence reveals that in each of the three instances in which a Long Reef homeowner requested a service animal accommodation on behalf of their tenant, Long Reef sought additional information to evaluate the request. (May 29, 2015 Tr. at 10:14-24; 15:7-16; 41:17-25; 42:1-3; Pl. Ex. 20; Pl. Ex. 38). A housing provider is entitled to conduct "a meaningful review of the requested accommodation to determine if such an accommodation is required by law." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (quoting *Prindable v. Ass'n of Apt. Owners*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003), *aff'd sub nom. DuBois v. Ass'n of Apt. Owners*, 453 F.3d 1175 (9th Cir. 2005))).

104. In each instance, however, the tenant requesting an accommodation moved out of Long Reef before the request was resolved. (May 29, 2015 Tr. at 13:7-18; 15:20-22; 42:18-23).

105. Accordingly, while the Court agrees that a housing provider cannot create insurmountable barriers in responding to accommodation requests under the guise of conducting a "meaningful review," there is insufficient evidence in the record to conclude that this was the case here.

106. In view of the foregoing, the evidence fails to establish that Long Reef intentionally discriminated against Nelson because of her disability. Accordingly, the Court will dismiss Nelson's disparate treatment claim.

### J.   Intentional Infliction of Emotional Distress

107. Intentional infliction of emotional distress occurs when "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Eddy v. V.I. Water & Power Auth.*, 369 F.3d 227, 231 (3d Cir. 2004).

108. In *Stevens v. Louise*, 2016 V.I. LEXIS 80 (V.I. Super. Ct. June 13, 2016), the Superior

Court of the Virgin Islands, after conducting a *Banks* analysis, adopted the majority rule

for intentional infliction of emotional distress claims as set forth in RESTATEMENT

(SECOND) OF TORTS § 46. *Id*. at *6.

109. In order to be liable for intentional infliction of emotional distress, a defendant's conduct

must be "so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a

civilized community." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d; *see also Glasgow*

*v. Veolia Water N. Am., Operating Servs., LLC*, 2010 U.S. Dist. LEXIS 99570, at *29

(D.V.I. Sept. 21, 2010).

110. Section 46 of Restatement (Second) of Torts explains:

> It has not been enough that the defendant has acted with an intent which is
> tortious or even criminal, or that he has intended to inflict emotional
> distress, or even that his conduct has been characterized by "malice," or a
> degree of aggravation which would entitle the plaintiff to punitive damages
> for another tort. Liability has been found only where the conduct has been
> so outrageous in character, and so extreme in degree, as to go beyond all
> possible bounds of decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community. Generally, the case is one in which the
> recitation of the facts to an average member of the community would arouse
> his resentment against the action, and lead him to exclaim, "Outrageous!"

> The liability clearly does not extend to mere insults, indignities, threats,
> annoyances, petty oppressions, or other trivialities.

RESTATEMENT (SECOND) OF TORTS § 46 cmt. d.

111. The evidence relied upon by Nelson to support her intentional infliction of emotional

distress claim is as follows: (1) Renzi knew of the death of her brother, and of the murder

of her friend, Peter, yet continued to fail to respond to her requests or discuss her

accommodation for an emotional support animal; (2) Long Reef failed to identify the

information needed to support her request for a reasonable accommodation; (3) Long Reef charged her pet fines, sued her in the Superior Court of the Virgin Islands, and filed a lien against her condominium unit, which included Long Reef's attorney's fees; and (4) Long Reef has never removed the pet fines from her account.

112. Although, as discussed below, the Court finds that Long Reef's conduct was callous and reckless, the evidence presented at trial, even taken in combination, does not demonstrate the kind of "extreme and outrageous conduct" necessary to sustain an intentional infliction of emotional distress claim. *See* RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (the conduct must "go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community").

113. Accordingly, the Court concludes that Nelson failed to establish her intentional infliction of emotional distress claim, and will, therefore, dismiss the claim.

### K. Damages

114. Section 3613(c)(1) of the FHA states:

> [I]f the court finds that a discriminatory housing practice has occurred . . ., the court may award to the plaintiff actual and punitive damages, and . . . may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1).

115. Section 3613(c)(2) further provides that "the court, in its discretion, may allow the prevailing party, other than the United States, [] reasonable attorney's fees and costs." 42 U.S.C. § 3613(c)(2).

116. The Supreme Court has held, in the civil rights context, that "[t]he attorney's fees provided for in a contingent-fee agreement is not a ceiling upon the fees recoverable[.]"

*Blanchard v. Bergeron*, 489 U.S. 87, 96 (1989) (addressing attorney's fees under 42 U.S.C. § 1988, which permits an award of attorney's fees to a prevailing party in federal civil rights actions). Rather, the prevailing party is entitled to her reasonable attorney's fees and costs. *See Quigley v. Winter*, 598 F.3d 938, 956 (8th Cir. 2010) (applying *Blanchard* to determine the effect of a contingency fee agreement on an award of attorney's fees under the FHA).

117. An award of punitive damages "does not require 'outrageousness': a jury may 'assess punitive damages when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Alexander v. Riga*, 208 F.3d 419, 430-31 (3d Cir. 2000) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983) (alteration omitted)).

118. "Malice" and "reckless indifference" refer to a housing provider's "knowledge that it may be acting in violation of federal law." *Id*. at 431 (citing *Kolstad v. American Dental Association*, 527 U.S. 526, 535 (1999)). The focus is on the "actor's state of mind," not "egregious or outrageous discrimination." *Id*.; *see also Miller v. Apartments & Homes*, 646 F.2d 101, 111 (3d Cir. 1981) (stating that punitive damages are appropriate when a defendant has acted "with actual knowledge" or "reckless disregard" of whether he is violating a federally protected right, or "with such conscious and deliberate disregard of the consequences" of actions that the "conduct is wanton").

119. The mere existence of the FHA is not, however, "a guarantee of eligibility for punitive damages because a defendant might not be aware of the federal law he or she violated or he or she might have honestly believed that the discrimination was permissible." *Alexander*, 208 F.3d at 432 (citing *Kolstad*, 527 U.S. at 536).

120. In the instant case, Nelson established through her testimony that she incurred approximately $12,000.00 in actual damages during the period of time that she did not live at Long Reef. (*See* May 27, 2015 at 162:19-25; 163:1-8); *see also Marrero v. Brin*, 536 F. App'x 270, 275-76 (3d Cir. 2013) (citing *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 (5th Cir. 2000) (stating that the plaintiff's testimony alone may be sufficient evidence to support an award of compensatory damages)).

121. Nelson also presented evidence that Long Reef acted with "reckless or callous indifference" to her federally protected right to a reasonable accommodation under the FHA. The Court therefore finds that she is entitled to an award of punitive damages.

122. Although Long Reef acknowledged through the testimony of Renzi that it must comply with the FHA, "[i]f it applies," it (1) did not respond to Nelson's repeated requests to identify the documentation required for a service animal; (2) failed to request documentation from Nelson that supported her request for an exception to the "no pets" policy; (3) refused to engage in a dialogue with Nelson about her requested accommodation; (4) imposed fines on Nelson for violating the "no pets" policy, and initially imposed a lien on her property, notwithstanding Nelson's repeated requests for information pertaining to an accommodation; and (5) filed a lawsuit against Nelson— almost immediately after her initial request for an accommodation—seeking a declaratory judgment that it was not required to make the requested accommodation. Thus, there was no attempt by Long Reef to obtain relevant information from Nelson to determine if the FHA applied.

123. This evidence demonstrates that Long Reef was aware of its obligations under the FHA, but acted with reckless and callous indifference to Nelson's federally protected right to a

reasonable accommodation.

124. Accordingly, the Court will award Nelson $12,000 in actual damages, $45,000 in punitive damages, and her reasonable attorney's fees and costs—in an amount to be determined upon proper application by Plaintiff.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Date: August 5, 2016                          _____/s/_____
                                              WILMA A. LEWIS
                                              Chief Judge